IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Case No. 19-cr-66 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| MARZAN WILLIAMS. | ) | |

**MEMORANDUM OPINION AND ORDER**

On February 20, 2019, Defendant was charged with two counts of distribution of a controlled substance, in violation of 21 U.S.C. § 841(a)(1), two counts of possession with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1), one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1), and one count of possession of a firearm in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A). [9.] Currently before the Court is Defendant's motion to suppress statements Defendant made and evidence seized by law enforcement on January 22, 2019. [137.] In addition to reviewing the parties' briefs [137, 140, 146, 154], the Court held an evidentiary hearing [143]. For the reasons stated below, the Court denies Defendant's motion. [137.]

**I.   Background**

Because "the resolution of a motion to suppress is a fact-intensive inquiry," the Court's "credibility determinations are reviewed deferentially," given that the Court had the "opportunity at the suppression hearing to hear the testimony and observe the demeanor of the witnesses." *United States v. Kempf*, 400 F.3d 501, 503 (7th Cir. 2005); see, *e.g.*, *United States v. Correa*, 908 F.3d 208, 214–15 (7th Cir. 2018) (affirming this Court's credibility determinations of conflicting defendant and officers' testimony "with or without corroboration"). The Court held an evidentiary hearing and both parties presented documentary evidence and witness testimony. [143.] In

addition, parties provided briefing. [137, 140, 146, 154.] From all this information, two distinct versions of how Defendant was arrested January 22, 2019 emerge, which the Court now recounts. The facts below are undisputed unless otherwise noted.

Based on information from previous undercover operations, on January 22, 2019 at approximately 12:44 PM, Task Force Officers ("TFO") Antonio Vasquez, Russell Zohfeld, and a team of affiliated law enforcement officers executed a controlled drug buy. [Tr. 5, 49–50.] As part of this operation, officers pulled over Defendant in his car. [Tr. 13.] A man in the passenger side seat of Defendant's car exited immediately before the arrest and left the scene. [Tr. 53.] Officers then arrested Defendant. [Tr. 6, 53–54.] At the time, Defendant was 34 years old and has been previously arrested and read *Miranda* warnings several times. [Tr. 69, 80.] To effectuate the arrest, TFO Vasquez handcuffed Defendant and placed him in his vehicle. [Tr. 6–7, 54.] Another officer sat in the backseat for the drive back to the Matteson Police Station. [Tr. 8, 56–57.]

The parties diverge on what occurred while Defendant was in transport to the Matteson Police Station. According to TFO Vasquez, Defendant did not appear physically injured or agitated when he was arrested. [Tr. 7.] On placing Defendant in the front passenger seat, TFO Vasquez removed a plastic card from his outer vest and read *Miranda* warnings aloud. [Tr. 7–8, 14.] TFO Vasquez testified that he generally reads *Miranda* rights at the outset of an arrest because it is a "vulnerable time," and he wants to ensure that the arrestee's rights are protected. [Tr. 7–8.] TFO Vasquez testified that Defendant nodded while he read and responded by stating, "I'm willing to do anything to get out of this jam." [Tr. 8, 15.]

While en route to the Matteson Police Station, TFO Vasquez testified that Defendant volunteered various information and consented to search. When TFO Vasquez stated that law

enforcement knew the location where Defendant kept narcotics, Defendant stated, "Damn, you-all know about that spot." [Tr. 9.] TFO Vasquez further asked for Defendant's consent to search his residence. [Tr. 9.] Defendant responded, "You-all are going to search it anyway." [Tr. 9.] TFO Vasquez did not interpret Defendant's response as consent to search, so he followed up by asking, "Okay, but I'm asking you permission. Can we search your apartment?" [Tr. 9–10.] Defendant then stated "yes," indicating he consented to officers searching his apartment. [Tr. 10.] In response to additional questions from TFO Vasquez, Defendant provided his unit number and the location of his keys and requested that officers not damage his residence. [Tr. 10.] TFO Vasquez further asked Defendant what law enforcement would find inside his apartment. [Tr. 10.] Defendant told him that there was a "dusting on his bed," clarifying that it was about "2 ounces, but not no damn kilo" of narcotics. [Tr. 10.]

Defendant remembers his interaction with law enforcement on the drive to Matteson Police Station differently. According to Defendant, upon being put in the police vehicle, TFO Vasquez began to immediately question him. [Tr. 54.] Defendant testified that he was "a little agitated" and immediately stated that he needed his lawyer. [Tr. 54–55.] TFO Vasquez ignored Defendant's request for an attorney and continued to question him. [Tr. 55–56.] Defendant denied any criminal involvement and again requested an attorney. [Tr. 55, at 6; 56, at 19.] When TFO Vasquez started to read Defendant *Miranda* warnings, Defendant interrupted him to say, "No, I don't need to hear that. Now I need my attorney." [Tr. 56.] TFO Vasquez responded by stating, "If you go that route, we're not going to be able to help you." [Tr. 56.] TFO Vasquez later stated, "Look, if you help us out, we'll help you. Some people just walk away from this situation without getting any

charges."[1] [Tr. 58.] Defendant denied saying, "I'm willing to do anything to get out of this jam." [Tr. 77.]

According to Defendant, while in the car, TFO Vasquez communicated over the radio with other law enforcement officers who were searching for Defendant's apartment and asked Defendant for information related to his apartment, including his unit number. [Tr. 58–59.] Defendant testified that he repeatedly stated he just started to rent the apartment and that he needed the apartment for his domestic partner to live in. [Tr. 58.] He also requested that police not destroy his apartment, as they already had the keys and had threatened to break down his and other family members' doors. [Tr. 58.] Defendant agrees that at some point in the drive he stated that officers were "going to search" his apartment "anyway" but denies verbally consenting to the search of his apartment. [Tr. 77.]

Both parties agree that once officers and Defendant arrived at the Matteson Police Station, TFO Vasquez started intake procedures and placed Defendant in an interview room with TFO Zohfeld at approximately 1:38 PM.[2] [Tr. 11, 50.] During the interview, TFO Zohfeld was not armed. [Tr. 25.] TFO Zohfeld failed to record the interview. [25.] TFO testified that he had never interviewed an arrestee, nor had he been present for any interview at Matteson Police Station, and thus he was unfamiliar with the station's recording system. [Tr. 25–26.] TFO Zohfeld later

---

[1] TFO Vasquez testified that he ordinarily says something like that to arrestees but does not specifically remember saying this to Defendant. [Tr. 18.]

[2] Defendant additionally testified that when he arrived at the Matteson Police Station, officers attempted to place him in "lock-up," but he started to have a panic attack. [Tr. 61.] Instead, officers placed Defendant in an interrogation room, handcuffed him to the desk, and gave him water to calm him down. [Tr. 61.] TFO Vasquez and TFO Zohfeld both describe describes Defendant's demeanor as "calm." [Tr. 11, 16.] Because Defendant does not argue that this panic attack affected his ability to understand the written forms that he purportedly signed, the Court does not address these facts further. [130, 146.]

learned that to record, an officer must manually flip a light switch to active the recording equipment in the interview room, which he failed to do. [Tr. 25–26.]

The parties similarly dispute what occurred during TFO Zohfeld's interview of Defendant. According to the government, at the beginning of the interview, TFO Zohfeld advised Defendant that he needed to complete a magistrate waiver, a Miranda waiver, and a consent to search form.[3] [Tr. 26–29, 40.] The consent to search form stated that Defendant had "not been threatened, nor forced in any way" to cooperate and that he "freely consent[ed] to the search."[4] [Tr. 28, at 18–23.] After TFO Zohfeld read and dated the consent to search form to Defendant, Defendant signed it. [Tr. 27–29.] At approximately 1:40 PM, TFO Zohfeld then read aloud *Miranda* warnings to Defendant from a written form. [Tr. 29–31.] As TFO Zohfeld read each portion of the form, Defendant wrote his initials to indicate that he understood each portion. [Tr. 31–32.] Defendant seemed to independently read the form and wrote "yes" next to the line that read, "Do you understand your rights?" [Tr. 32–33.]

After Defendant signed these forms, TFO Zohfeld asked him questions pertaining to his investigation of Defendant. [Tr. 33.] Defendant indicated that he understood police searched his apartment and found "a few ounces" of suspected narcotics and a firearm. [Tr. 33–34.] At some point during the interview, law enforcement officers searching Defendant's apartment called TFO Zohfeld as Defendant's apartment alarm had been set off and they needed Defendant's assistance in turning it off. [Tr. 34.] In response, Defendant provided the passcode to the alarm, the password

---

[3] Defendant testified that he signed the magistrate waiver form but did not read it. [Tr. 69.] Because the magistrate waiver form is not at issue in this motion, the Court will not further discuss it.

[4] TFO Zohfeld did not advise the team searching Defendant's apartment that he had received written consent to do so. [Tr. 48.]

5

"in case the alarm company called," and the location of the alarm box for law enforcement to shut off. [Tr. 34.]

As with the car ride to Matteson Police Station, Defendant has a vastly different recollection of his interview with TFO Zohfeld than the version recounted by the government witnesses. Defendant denies signing the consent to search form, although he recognized his signature. [Tr. 70–71.] Rather, he argues that he signed a property release form. [Tr. 70.] During the interview, Defendant recognized his alarm company was calling him but denies giving law enforcement his consent to search his apartment. [Tr. 65.] Once Defendant saw the notification, he realized that officers were in his apartment and requested that officers not "kick the door in," as they had threatened to do so if he failed to consent. [Tr. 63, 65.] Defendant told officers he had narcotics and a firearm in his apartment and where to find them. [Tr. 75–76.]

Defendant denies that he was read *Miranda* warnings at the outset of the interview, although he acknowledged that he signed and initialed the written *Miranda* waiver. [Tr. 64, 71–72.] According to Defendant, Defendant asked more than twice for his attorney during the interview. [Tr. 67.] Each time Defendant did so, officers continued to talk to him, stating things like, "sometimes people just don't go away, but if you help us out, we'll speak up for you." [Tr. 67–68.] TFO Zohfeld even stepped out of the interview room at one point and stated he was calling the prosecutor. [Tr. 68.] Defendant denied involvement in any drug dealing, instead accusing the other man that left his car immediately before the arrest. [Tr. 64, 75.]

After the interview concluded approximately an hour and a half later—at approximately 2:50 PM—Defendant made several FaceTime calls with family members. [Tr. 11, 19–20, 34.] TFO Vasquez requested to search Defendant's phone and Defendant refused. [Tr. 11–12, 35.] Defendant shortly thereafter asked for an attorney and officers stopping asking Defendant

6

questions. [Tr. 12, 35, 50.] According to TFO Zohfeld, this was the first time that Defendant requested an attorney. [Tr. 35.]

## II. Procedural Background

On January 23, 2019, Defendant was charged by criminal complaint with distribution of a controlled substance, in violation of 21 U.S.C. § 841(a)(1). [1.] On February 20, 2019, Defendant was charged with two counts of distribution of a controlled substance, in violation of 21 U.S.C. § 841(a)(1), two counts of possession with intent to distribute a controlled substance, in violation of 21 U.S.C. § 841(a)(1), one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1), and one count of possession of a firearm in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A). [9.]

On March 29, 2022, Defendant moved to suppress all statements made to officers on the day of his arrest and to exclude the potential evidence found at his apartment. [137.] The government filed its response on April 22, 2022. [140.] On May 3, 2022, the Court held an evidentiary hearing. [143.] TFO Vasquez, TFO Zohfeld, and Defendant testified. [Tr. 1–83.] After the hearing, both parties filed post-hearing briefing. [146, 154.]

## III. Legal Standard

### A. The Fifth Amendment and *Miranda* Warnings

The Fifth Amendment protects individuals from self-incrimination. U.S. CONST. amend. V. In *Miranda v. Arizona*, the Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards"—now known as *Miranda* warnings—"effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); see also *Colorado v. Connelly*, 479 U.S. 157, 168 (1986) (establishing that for such statements to

be admissible, the government must demonstrate by a preponderance of the evidence that a defendant voluntarily waived his Fifth Amendment privilege against self-incrimination). Law enforcement officers are required to administer *Miranda* warnings only when a suspect is in custody and subjected to interrogation. *Miranda*, 384 U.S. at 444; *United States v. Jackson*, 189 F.3d 502, 510 (7th Cir. 1999).

A suspect may validly waive his Fifth Amendment privilege against self-incrimination. *Miranda*, 384 U.S. at 444; *United States v. Outland*, 993 F.3d 1017, 1021 (7th Cir. 2021). The waiver must be "the product of a free and deliberate choice rather than intimidation, coercion, or deception and made knowingly and intelligently, with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Outland*, 993 F.3d at 1021 (internal quotation marks omitted) (citing *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). "To be voluntary, the government must show the defendant understood the rights he purported to waive." *United States v. Mercado*, 53 F.4th 1071, 1086 (7th Cir. 2022) (citing *Outland*, 993 F.3d at 1022). "A *Miranda* waiver can be either express or implied." *United States v. Brown*, 664 F.3d 1115, 1118 (7th Cir. 2011) (citation omitted); see also *United States v. Smith*, 218 F.3d 777, 781 (7th Cir. 2000) (noting that waiver "may be inferred from a defendant's understanding of [his] rights coupled with a course of conduct reflecting [his] desire to give up [his] right[s]"). The Court's ruling on waiver will often be decided by the Court's "evaluation of the parties' credibility." *Mercado*, 53 F.4th at 1086 (citation omitted).

### B. The Fourth Amendment and Consent Searches

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. "Warrantless searches are presumptively unreasonable under the Fourth Amendment, but are

8

permissible when the defendant voluntarily consents to the search." *United States v. Strache*, 202 F.3d 980, 984 (7th Cir. 2000) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). "If the Government relies on this exception, it must prove by a preponderance of the evidence that the defendant consented to the disputed search." *United States v. Thurman*, 889 F.3d 356, 366 (7th Cir. 2018) (citation omitted). Consent cannot "be coerced, by explicit or implicit means, by implied threat or covert force." *Schneckloth*, 412 U.S. at 228.

IV. **Analysis**

"As is often the case with motions to suppress," the Court is "faced with a veritable he said versus they said." *Thurman*, 889 F.3d at 364 (cleaned up and citation omitted). The Court now weighs the testimony of TFO Vasquez, TFO Zohfeld, and Defendant and the admitted evidence to determine which version of events is most plausible. Having done so, the Court denies Defendant's motion to suppress. [137.]

    A. **Absence of Recording**

Before discussing Defendant's Fourth and Fifth Amendment arguments, the Court first addresses Defendant's contention that officers' failure to record his interview at Matteson Police Station renders his later statements inadmissible or, at a minimal, subject to a jury instruction regarding their lack of reliability. [146, at 1–4.] The Court rejects Defendant's arguments.

The Court is careful to note that recording equipment, including body camera equipment and video and audio recording equipment installed in police stations, can provide important evidence of police accountability and transparency, as it promotes accurate analysis of stops, arrests, and detentions. Nonetheless, while recordings of these types can be useful, their absence does not constitute a constitutional violation for purposes of excluding evidence, even as to recordings that are required by local policies. See *United States v. Montgomery*, 390 F.3d 1013,

9

1017 (7th Cir. 2018) (holding that the Constitution does not mandate recording of arrests and "does not render the agents' past actions unlawful or their testimony implausible"); *United States v. Thurman*, 889 F.3d 356, 366–67 (7th Cir. 2018); see also *United States v. Caceres*, 440 U.S. 741, 754–57 (1979) (holding that the federal exclusionary rule does not generally extend to violations of statutes and regulations).

Defendant's attempt to distinguish *Montgomery* is not persuasive. [146, at 3.] In *Montgomery*, a defendant similarly argued that an ATF policy requiring recording of all arrests meant that law enforcement's failure to do so was itself a constitutional violation sufficient to invoke the exclusionary rule. *Montgomery*, 390 F.3d at 1017. The Seventh Circuit disagreed, noting that while Illinois state law mandates recording of certain custodial interrogations, "no one has intimated that these laws were constitutionally required, and we see no hint that the Supreme Court is ready to take such a major step." *Id.* Indeed, as Defendant in the present case acknowledges, "there currently is no federal statute or U.S. Supreme Court case requiring the electronic recording of custodial sessions." [146, at 3.] This Court similarly "decline[s] [Defendant's] invitation to enlarge *Miranda* so as to require the electronic recording of all interrogations." *Montgomery*, 390 F.3d at 1017.

### B. Suppression Under the Fifth Amendment

Defendant makes several arguments that his statements should be suppressed under the Fifth Amendment. The Court finds none of these arguments persuasive.

Defendant contends that (1) officers never administered a *Miranda* warning to him while questioning him on the drive to the Matteson Police Station, (2) he never verbally waived *Miranda* warnings read to him, and (3) officers repeatedly ignored his requests for an attorney.[5] [137, at 1–

---

[5] The parties agree that Defendant was in custody when officers questioned him while driving to the Matteson Police Station. See *Miranda*, 384 U.S. at 444; *Jackson*, 189 F.3d at 510.

2.] To resolve Defendant's arguments, the Court must assess the credibility of TFO Vasquez's testimony. *Kempf*, 400 F.3d at 503. Having had the opportunity to observe firsthand his demeanor under direct- and cross-examination, the Court finds TFO Vasquez's testimony consistent, plausible, and unbiased. TFO Vasquez testified that after placing Defendant in his vehicle, he read him *Miranda* warnings. [Tr. 7–8, 14.] TFO Vasquez noted that he ordinarily does this at the outset of an encounter, as arrestees often implicate themselves early in an encounter and he wants to ensure they are apprised of their legal rights. [Tr. 7–8.] TFO Vasquez testified that Defendant nodded while he read the warnings and responded by stating, "I'm willing to do anything to get out of this jam." [Tr. 8, 15.] Finally, in contrast to Defendant's argument that TFO Vasquez was "silent" as to whether Defendant invoked his right to attorney [146, at 11], when asked on cross-examination as to whether Defendant asked for an attorney immediately after being read *Miranda* warnings, TFO Vasquez denied that Defendant had done so [Tr. 17–18]. Put together, TFO Vasquez's credible testimony leads the Court to reject Defendant's contention that he was not administered *Miranda* warnings, he did not verbally waive his Fifth Amendment right against self-incrimination, and officers ignored his requests for his attorney.

Defendant attempts to cast doubt on TFO Vasquez's credibility because TFO Vasquez testified that Defendant's demeanor when arrested was calm and not agitated [Tr. 7], in contrast to Defendant's testimony that he felt "a little agitated" [Tr. 54–55]. Defendant contends that "it is simply implausible that an individual undergoing such a process would be calm in such circumstances." [146, at 10.] While the Court accepts that TFO Vasquez and Defendant testified differently about their perceptions of Defendant's demeanor, the difference between "not agitated" and "a little agitated" is immaterial. Concededly, this was not Defendant's first arrest.

11

Next, Defendant denies that he signed a written *Miranda* waiver. [137, at 2.] Defendant contends that to the extent that he did sign a written waiver of his *Miranda* rights, "he did not understand the document he signed" and that law enforcement "agents used threats and otherwise misled Defendant in extracting a purported written waiver." [*Id.*] The Court interprets Defendant's latter argument to be that he did not knowingly and intelligently waive his *Miranda* rights. [*Id.*, at 2–3; 146, at 11.] The Court rejects both arguments.

The Court can easily dispose of Defendant's first argument that he did not sign a written *Miranda* waiver. Much like the Court's analysis above regarding TFO Vasquez's testimony, here, the Court must resolve whether TFO Zohfeld was credible in his testimony. *Kempf*, 400 F.3d at 503. Having had the opportunity to assess his demeanor, the Court finds that TFO Zohfeld plausibly testified to the events of January 22, 2019. TFO Zohfeld credibly testified that he read aloud *Miranda* warnings to Defendant, Defendant initialed each portion of the form and wrote "yes" next to the line that read, "Do you understand your rights?" [Tr. 29–33.] TFO Vasquez credibly testified to the same. [Tr. 7.] The *Miranda* waiver itself further supports the officers' testimony. Defendant even acknowledged that the *Miranda* waiver form bore his signature and handwriting, including attestations that he understood his rights. [Tr. 71–72.] Put together, the testimony and evidence credibly establish that Defendant signed a written *Miranda* waiver, and the Court accordingly rejects Defendant's argument to the contrary.

The Court also rejects Defendant's contention that he did not knowingly and intelligently waive his *Miranda* rights in part based on the officers' conduct. Whether Defendant voluntarily waived his Fifth Amendment right against self-incrimination is assessed based on the totality of circumstances, including defendant's background and conduct, including age and education, his experience with law enforcement, the duration and conditions of the interview, and whether law

enforcement officers used coercive techniques, either psychological or physical. *United States v. Thurman*, 889 F.3d 356, 364–65 (7th Cir. 2018) (citation omitted); *United States v. Shabaz*, 579 F.3d 815, 820 (7th Cir. 2009) (citation omitted). The only factor that indicates that Defendant did not knowingly and intelligently waive his *Miranda* rights is the duration of Defendant's detention and interview, which was just over two hours. [Tr. 14, 49–50.]

Indeed, the rest of the factors indicate that Defendant did knowingly and intelligently waive his *Miranda* rights. Defendant was 34 years old at the time of his arrest and thus, not a minor. [Tr. 69.] There is no indication that Defendant's intelligence or education were deficient and thus affected his understanding of *Miranda* rights or waiver thereof. Indeed, after officers read Defendant the *Miranda* waiver form in its entirety, Defendant had no questions and thereafter signed and initialed each portion, indicating affirmatively that he understood them. [Tr. 29–33, 70.] Defendant thereafter answered officers' questions. [Tr. 33–35]; see *Brown*, 664 F.3d at 1118 (upholding proper waiver when officers read *Miranda* warnings twice, defendant acknowledged them, and proceeded to answer questions). At the time of his arrest, Defendant had had substantial contact with the criminal justice system, having been previously arrested and convicted of various crimes, and, as a result, read *Miranda* warnings several times. [Tr. 80]; see *Brown*, 664 F.3d at 1118 (finding waiver where defendant had "substantial experience with the criminal justice system due to six previous convictions"); see also *United States v. Banks,* 78 F.3d 1190, 1198 (7th Cir. 1996) (finding waiver where defendant had "prior experience with law enforcement officials") *vacated on other grounds by Mills v. United States,* 519 U.S. 990 (1996).

Finally, the Court sees no evidence that officers used prohibited techniques. Defendant summarily concludes that "agents used threats and otherwise misled Defendant in extracting a purported written waiver" in his initial motion but does not state *how* officers did so in any of his

briefing. [137, 146.] Rather, he merely reiterates that he asked for an attorney and was ignored, a contention rejected above. [146, at 11.] The officers did not use "coercive techniques, either psychological or physical" in their interview of Defendant. *Shabaz*, 579 F.3d at 820. TFO Zohfeld went through a *Miranda* waiver form, a magistrate form, and a consent to search form with Defendant before he signed each. [Tr. 26–33.] TFO Zohfeld thereafter asked questions regarding the arrest. [Tr. 33–35.] Finally, when Defendant asked to contact family members, TFO Zohfeld readily allowed him to. [Tr. 11, 19–20, 34–35.] There is no indication that Defendant was physically coerced or otherwise threatened. *Shabaz*, 579 F.3d at 820.

In sum, based on the totality of the circumstances, Defendant knowingly and intelligently waived his *Miranda* rights. As a result, the Court denies Defendant's motion to suppress on Fifth Amendment grounds.

### C. Suppression Under the Fourth Amendment

Defendant argues that evidence was seized from his apartment in a manner that violates the Fourth Amendment. The Court concludes that officers validly seized evidence with Defendant's verbal and written consent.

According to Defendant, his original "oral consent was invalid" and "any subsequent written consent did not purify or otherwise absolve the police misconduct in the original constitutional violation." [146, at 12.] Defendant's argument relies entirely on the Court accepting his version of events—*i.e.*, that TFO Vasquez did not ask for or receive Defendant's consent to search while driving to the Matteson Police Station and that officers proceeded to search Defendant's apartment anyway, culminating in officers setting off Defendant's home alarm and needing Defendant's aid to turn off. As the Court rejects Defendant's version of events, it dismisses Defendant's contention that he did not verbally consent to search his apartment.

14

As noted above, the Court is well-positioned to consider which version of events is more credible and thus likely true. *Kempf*, 400 F.3d at 503. Having had the opportunity to assess firsthand TFO Vasquez's demeanor, the Court concludes that TFO Vasquez credibly testified that he asked for Defendant's consent to search his apartment and received it prior to officers searching Defendant's apartment. TFO Vasquez testified that he asked for Defendant's consent to search his residence, requesting a specific affirmative "yes" before believing that he had received it. [Tr. 9–10.] Indeed, TFO Vasquez further asked Defendant for unit number. [Tr. 10.] Defendant apparently understood that he had given his consent to search, as evidenced by his provision of unit number and apartment keys and his request that officers not damage his residence. [Tr. 10.] TFO Vasquez relayed this information in an even-handed, consistent, and credible manner.

Defendant's only argument that TFO Vasquez was not credible is that TFO Vasquez's testimony regarding Defendant's consent to search was a "stammer." [146, at 12.] Defendant does not cite to caselaw or otherwise explain why this might be important. [137, 146.] Further, Defendant references two pages of the hearing transcript, none of which include a stammer by either the attorney asking TFO Vasquez questions or TFO Vasquez's testimony. [Tr. 9–10.] As such, the Court rejects this argument and finds that Defendant verbally consented for officers to search his apartment.

Defendant makes two final interrelated consent arguments to suppress on Fourth Amendment grounds. First, Defendant argues that his consent was involuntary because TFO Vasquez made a false promise of leniency. [146, at 13.] Second, Defendant contends that TFO Vasquez's purported false promise renders Defendant's subsequent written consent a product of official misconduct. [146, at 13–14.] The Court rejects both contentions.

At the outset, the Court considers whether Defendant's consent to search was voluntary under applicable caselaw. Courts consider the totality of the circumstances, including Defendant's "age, education, and intelligence; whether he was advised of his constitutional rights; how long he was detained prior to consent; whether he consented immediately or after police made several requests; whether the police used physical coercion; and whether he was in custody." *United States v. Ruiz*, 785 F.3d 1134, 1146 (7th Cir. 2015) (citations omitted). Courts may additionally consider an arrestee's "experience with the criminal justice system." *United States v. Jones*, 22 F.4th 667, 675–76 (7th Cir. 2022) (citation omitted). The one factor that weighs in favor of no consent is that Defendant was in custody when police initially obtained Defendant's verbal consent. [Tr. 5, 28–33.]

The remaining factors all weigh in favor of a finding of consent. Much like the Court's prior analysis of whether Defendant voluntarily waived his *Miranda* rights, Defendant's age, education, and intelligence weigh in favor of consent. [Tr. 29–35, 69, 70.] Defendant was apprised of his constitutional rights both verbally and in writing. [Tr. 7–10, 14, 26–33, 40.] Defendant was arrested and taken into custody at approximately 12:44 PM and arrived at the station approximately twenty-five to thirty minutes later, meaning he gave verbal consent to search at the most thirty minutes into his detention. [Tr. 49–50, 58, 74.] Additionally, Defendant gave written consent to search at approximately 1:38 PM to 1:41 PM, meaning he gave written consent to search at the most an hour into his detention. [Tr. 27, 32.] Police made one request to search Defendant's apartment and clarified his answer as an affirmative. [Tr. 9–10.]

The one factor that is unclear is physical coercion, in that Defendant was handcuffed when he gave consent to search. [Tr. 14.] However, as the government points out [154, at 9], "an arrested, handcuffed suspect is capable of giving voluntary consent to the search of his home,"

16

especially when the record supports that the defendant both orally and verbally consented to search, as Defendant has here. *United States v. Beltran*, 752 F.3d 671, 680 (7th Cir. 2014) (citation omitted). As such, this factor weighs in favor of a finding of consent. Put together, these factors generally weigh in favor of finding that Defendant voluntarily consented for law enforcement to search his apartment.

The Court next considers Defendant's argument that his consent was rendered involuntary by a false promise of leniency. "[W]hile a false promise of leniency may render a statement involuntary, police tactics short of the false promise are usually permissible." *United States v. Villalpando*, 588 F.3d 1124, 1128 (7th Cir. 2009); *United States v. Rutledge*, 900 F.2d 1127, 1130 (7th Cir. 1990) (citations omitted) (noting that the government is not forbidden from inducing information from arrestees "with honest promises of consideration"). "Trickery, deceit, even impersonation do not render a confession inadmissible * * * unless government agents make threats or promises." *United States v. Kontny*, 238 F.3d 815, 817 (7th Cir. 2001) (citations omitted). Defendant needs "to establish that his interrogator made him a promise that was materially false and thus sufficient to overbear his free will." *Villalpando*, 588 F.3d at 1128 (citation omitted).

TFO Vasquez and other law enforcement officers did not make such a promise that was "materially false" and "sufficient to overbear [Defendant's] free will." *Villalpando*, 588 F.3d at 1128. Accepting Defendant's version of events, TFO Vasquez stated, "Look, if you help us out, we'll help you. Some people just walk away from this situation without getting any charges." [Tr. 57.] In essence, TFO Vasquez allegedly offered to help Defendant and noted that cooperation can generally aid arrestees. TFO Vasquez's statements fall short of false promise and thus are permissible. *Villalpando*, 588 F.3d at 1128. Indeed, in a similar case where officers offered "to

17

go to bat" for Defendant and that she would sit down" with the DEA, the police, and his probation officer to "work this out," the Seventh Circuit found that the officer had not made a false promise of leniency. *Id.* at 1129; *cf. Kontny*, 238 F.3d at 818 (citation omitted) (noting that if law enforcement had "promise the [defendants] they would not be prosecuted if they played ball with [them], for that conceivably is the kind of false promise that might induce a rational person to rely"). The allegations here fall short of even those advanced in *Villalpando* and therefore, do not constitute a false promise of leniency. Accordingly, Defendant's subsequent written consent to search is not tainted as a product of official misconduct.

## IV.   Conclusion

For the reasons stated above, Defendant's motion to suppress [137] is denied.

Dated:  February 13, 2023

							_____
							Robert M. Dow, Jr.
							United States District Judge